UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DENNIS EARL GEORGESON, | ) | 1:05-CV-1121 AWI JMD HC |
| | ) | |
| Petitioner, | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| v. | ) | REGARDING PETITION FOR WRIT OF |
| | ) | HABEAS CORPUS |
| | ) | |
| ACTING WARDEN MUNTZ, | ) | ORDER DIRECTING CLERK OF COURT |
| | ) | TO CHANGE NAME OF RESPONDENT |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Fresno County Superior Court. A jury convicted Petitioner of two counts of assault with a deadly weapon (Cal. Penal Code § 245(a)(1)), causing great bodily injury to Nikki L. (Cal. Penal Code § 12022.7(a)), and recklessly causing a fire that resulted in great bodily injury (Cal. Penal Code § 452(a)). The trial court sentenced Petitioner to a total prison term of seven years consisting of a three-year middle term for one of the assault counts, enhanced by a three-year consecutive term for causing great bodily injury, and a consecutive term of one year for the other assault count, which was one-third of the middle term. The court imposed, but stayed, a middle term sentence on the recklessly causing a fire charge. (Answer at 1-2.)

Petitioner appealed to the California Court of Appeal. On June 24, 2004, the court affirmed the judgment. (Answer at 2; Lodged Docs. 1-3.)

Petitioner filed a petition for review in the California Supreme Court. On September 7, 2004, the court summarily denied review. (Answer at 2; Lodged Docs. 4-5.)

Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court. On March 2, 2005, the court denied the petition in a reasoned opinion. (Answer at 2; Lodged Docs. 6-7.)

Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal. On April 28, 2005, the court summarily denied the petition. (Answer at 2; Lodged Docs. 8-9.)

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. On June 22, 2005, the court summarily denied the petition. (Answer at 2-3; Lodged Docs. 10-11.)

On September 6, 2005, Petitioner filed the instant petition in this Court. The petition raises the following three grounds for relief: 1) exclusion of all African-Americans and Hispanics from the jury panel violated equal protection; 2) trial court allowed conviction based on perjured testimony by refusing to allow portions of a police report into evidence and by refusing to order production of the deputy who wrote the report; and 3) trial court imposed an illegal sentence enhancement and violated the Sixth Amendment by imposing consecutive sentences.

On June 18, 2007, Respondent filed an answer to the petition.

**FACTUAL BACKGROUND**[1]

On November 28, 2001, Amie Chastain (Amie) was at her aunt's house in Kerman with her younger sister Carrie Chastain (Carrie), her cousins Brenda Martin (Brenda) and Kathy Nicole Loudin (Nikki), and other relatives. Petitioner, Brenda's boyfriend, arrived in the afternoon in his four-door Cadillac. Sometime later, Amie and Carrie asked Petitioner for a cigarette, and he gave them one. Petitioner lit the cigarette for Amie with a lighter he had in his hand. Although Amie had a Bic brand lighter, which she kept in her jeans pocket, Amie denied using the lighter to light her cigarette. Nikki had also gotten a cigarette from Petitioner, which she lit on the stove. Neither Amie

---

[1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of June 24, 2004 and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 3.

1  nor Nikki had any cigarettes of their own.  Amie let Carrie and Nikki each take one or two drags
2  from her cigarette.
3       A group that included Petitioner, Amie, Carrie, and Nikki went outside.  Nikki asked
4  Petitioner to give her a ride to go see her boyfriend, but Petitioner refused.  Nonetheless, Nikki and
5  Amie got into Petitioner's car and closed the doors--Nikki sat in the driver's seat and Amie sat in the
6  front passenger seat.  Nikki got rid of her cigarette before entering the car, but Amie was still
7  smoking hers.
8       Meanwhile, Petitioner was standing between the car and the motor home parked next to it
9  talking to Brenda, who was in the motor home.  Petitioner asked Brenda if she was ready to leave,
10 but she did not want to go with him.  Amie heard Petitioner say he wanted to go; she believed
11 Petitioner wanted her and Nikki to get out of his car because he was "steaming mad when he came
12 over to the car."  Petitioner opened the back passenger side door; Amie was still smoking her
13 cigarette.  Amie estimated it took about three minutes for her and Nikki to leave the house and get
14 into the car, and Petitioner opened the car door a couple of minutes later.
15      After opening the car door, Petitioner grabbed one of the two propane tanks that were on the
16 floorboard of the back seat, lifted it onto the back seat, and turned on a valve.  The tank's nozzle was
17 pointing in between the two front seats.  Amie immediately smelled the propane and felt it pouring
18 on the left side of her neck "like a fan."  Amie started screaming and yelling, "I'm smoking a
19 cigarette."  Amie testified that within seconds the car filled up with propane, making it difficult for
20 her to breathe.  Nikki also smelled the propane.  According to Amie, the rear driver's side window
21 may have been open; both Nikki and Carrie testified that Amie's window was open between two
22 inches and halfway.  Amie denied taking her lighter out of her pants when she was in the car.
23      Amie and Nikki tried to get out of the car, but their doors were stuck.  Amie finally managed
24 to get her door open; as she jumped out of the car she flicked her still-lit cigarette away from the car
25 with her left hand.  At that moment, an explosion occurred and the car caught fire.  Nikki was inside
26 the car when the fire erupted, but managed to escape through a backseat door.  Nikki was badly
27 burned.  An ambulance transported Nikki to the emergency room at University Medical Center.  She
28 was hospitalized for two days, bandaged, and given pain medication; she later had skin graft surgery.

Amie was given oxygen at the scene and taken by ambulance to University Medical Center, where she was treated and released after a couple of hours.

A few days after the fire, Petitioner voluntarily came into the Kerman Police Department after hearing the police wanted to interview him. Petitioner showed his car and the two propane tanks, which were in the car's back seat, to Detective Mark Chapman, a deputy sheriff with the Fresno County Sheriff's Department, and agreed to Detective Chapman's request to impound the car. Petitioner then agreed to be interviewed by Detective Chapman. Petitioner told Detective Chapman he gave a cigarette to one of the girls--he thought it was Amie--when they were inside the house. Petitioner believed Amie lit the cigarette herself. Petitioner said one of the girls wanted a ride to her boyfriend's house; Petitioner told her no. Petitioner said he walked to the hood of the car, raised it, and was going to start the car when he heard the car doors open and close; the girls had gotten into the car.[2] Petitioner told Detective Chapman the car doors operated with the exception of the driver's door; to open that door from the inside, the driver needed to pull the handle and "bop it with your shoulder."

Petitioner first said that after Nikki and Amie got into the car, he removed both propane tanks from the car. Petitioner later admitted turning on one of the tanks while Amie and Nikki were inside the car, stating "I cracked it open a quarter turn." Before turning the valve, Petitioner said he lifted up the tank and told the girls there was propane in the car so that the girls would be scared and get out of the car. Petitioner did not see either girl strike a lighter while they were in the car. He denied hearing any screaming and said he was holding onto the tank, or leaning into the car, when the explosion occurred. Petitioner's injuries, however, were not consistent with his story; instead, they were consistent with Petitioner having removed the propane tanks after the explosion. Petitioner told Detective Chapman he left the house in his smoldering car, which he started by manipulating wires under the hood, after a man told him he should leave.

Captain Kenneth Van Ornam, a deputy fire marshal who runs the fire prevention, arson, and fire investigation unit in the North Central Fire Protection District, investigated Petitioner's car at

---

[2] Apparently the car could not be started with a key; Detective Chapman testified that when he went to the car with Petitioner, Petitioner started the car by manipulating some wires located under the hood.

1  Detective Chapman's request, to determine the cause and origin of the fire.  From the burn patterns,
2  Captain Van Ornam determined the fire started in the car's center rear seat area, with one of the
3  propane tanks, and was caused by the "exposure and explosion of and ignition of propane."  In his
4  opinion, the tank was in an upright position between the seats, with the valve pointing toward the
5  front seats, when the fire started, and sometime during the fire, the tank was knocked over into a
6  horizontal position.  Captain Van Ornam testified the propane could have been ignited by an open
7  flame, including a lit cigarette, or an electronic spark.  Captain Van Ornam concluded that at least
8  one window--the passenger side window--was open at the time of the explosion.

        Defense

10  Brian Bachtelle, a fire investigator hired by the defense, criticized Captain Van Ornam's
11  findings.  Bachtelle testified he could not determine the cause and origin of the fire because there
12  was not enough work done at the beginning stages of the investigation to make such a determination;
13  in Bachtelle's opinion, Captain Van Ornam did not perform a true cause and origin investigation.
14  Bachtelle conducted some experiments and came to the conclusion that a lit cigarette would
15  not ignite propane.  In support of that opinion, he referred to a book entitled "The Control of Gas
16  Explosions in Buildings and Homes," as well as a Bureau of Alcohol, Tobacco, and Firearms (ATF)
17  study in which the ATF determined a cigarette would not ignite propane that was flowing into the
18  basement of a house.
19  On cross-examination, Bachtelle conceded the ATF study was done in buildings and he had
20  never seen a study on propane ignition inside a car.  The prosecutor had Bachtelle look at a
21  document from the "Propane Marketers Association."  Bachtelle admitted the document stated that
22  propane needed three ingredients to ignite--fuel, heat, and oxygen--and warned that a lit cigarette, an
23  arc in an electrical switch, an automobile ignition, or static electricity could all supply the heat
24  necessary to ignite a fire.  Bachtelle also admitted the document stated that propane is nontoxic and
25  not harmful to breathe in small concentrations, but breathing large concentrations may result in
26  suffocation and inhaling propane vapor may cause dizziness, loss of coordination, unconsciousness,
27  or death.  Bachtelle testified that if two gallons of liquid propane were released from a tank into a
28  car, the vapor would fill up the car.

# DISCUSSION

## I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

## II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state

U.S. District Court
E. D. California          Jp                                                    7

court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

**A.  Ground One**

Petitioner argues that his equal protection rights were violated when the prosecutor challenged and the court excused all of the African-Americans and Hispanics from the jury panel.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Docs. 1-3.) The issue was then raised in a petition for review to the California Supreme Court, which summarily denied the petition. (Lodged Docs. 4-5.) The California Supreme Court, by its "silent order" denying the petition, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that substantial evidence supported the trial court's finding that Petitioner did not make a prima facie showing of discrimination. The court further found that, even assuming a prima facie case was made, the prosecutor articulated valid, race-neutral reasons for challenging the jurors in question. People v. Georgeson, 2004 WL 1405742, *6-*8 (Cal. App. 2004).

Purposeful exclusion of jurors on account of race violates the Equal Protection Clause. Batson v. Kentucky, 476 U.S. 79, 84 (1986). "In *Batson,* we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. . . . First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (citations omitted).

Petitioner's trial counsel raised the *Batson* challenge based on the exclusion of jurors number

8, 11, 14, 19, 23, and 28. (Lodged Doc. 12 at 207.) Juror number 19, however, was excused by the defense. (Lodged Doc. 14, ART of 10/22/02 at 67.) Jurors number 8 and 11 were excused for cause, which does not implicate *Batson*. Id. at 6, 11; see U.S. v. Kendle, 190 Fed.Appx. 909, 916 (11th Cir. 2006) ("[N]o authority suggests *Batson* extends to the area of challenges for cause."). The prosecution did use peremptory challenges to excuse jurors number 14, 23, and 28. (Lodged Doc. 14, ART of 10/22/02 at 42, 44, 68.)

> During voir dire, jurors number 14 and 23 stated as follows:
>
> [Juror Number 14]: I have lived in Fresno for the past ten years. I'm not married. I have an adult child. I have a college education. For my occupation, it's managing a funeral home, a small family business. And I am trying to create leisure time in order to clear out my mother's estate. (Lodged Doc. 14, ART of 10/21/02 at 46.)
>
> [Juror Number 23]: I live in Sanger. I've been living there all my life. I'm not married. I have no kids. My educational background is high school and some college. I'm not employed right now, but the last job I had was in construction. I carried it for about half a year. My application at my home right now is I'm the oldest in my home, and because of my mother passing away this past August, my responsibilities have gone from just being a brother to now more or less a mother/father figure I guess. My leisure time, I guess, now is more spent on my family. (Lodged Doc. 14, ART of 10/22/02 at 23-24.)

Juror number 28 acknowledged that he did not understand the written questions posed to the potential jury members because he could not read. (Lodged Doc. 14, ART of 10/22/02 at 48.)

> The prosecutor stated her reasons for exercising peremptory challenges against jurors number 14, 23, and 28 as follows:
>
> In excusing [Juror Number 14], there was an issue as to her as a single mom managing a small business that she was – I felt that she would not be able to put that aside in her deliberations and that she was preoccupied with that, and she did in fact state that she was her sole support.
>
> . . .
>
> [Juror Number 28] couldn't read, and I felt that that would be an issue as to him as far as for his abilities to understand the intricacies of an arson case. I would have to go through specific details. In fact, there's one – two of the exhibits in this case include formalized reports from the Department of Justice and from the Sheriff's Department. [Juror Number 23], his mother just passed away and he was the sole occupant of the home as far as an adult. He was taking care of his – he assumed the role of mother and father for both of the children in the home at that time and was clearly preoccupied with that occupation and what he was having to deal with at home.

(Lodged Doc. 12 at 208-09.) The record shows that the state court's determination was not unreasonable, as Petitioner failed to make a prima facie case that prospective jurors were challenged

because of their group association.  Further, even if a prima facie case had been established, the prosecutor articulated valid, race-neutral reasons for exercising the peremptory challenges in question.

### B.  Ground Two

Petitioner argues that the trial court allowed him to be convicted with perjured testimony by refusing to allow portions of a police report into evidence and by refusing to order production of the deputy who wrote the report.  Petitioner sought to have the evidence introduced to show that Nikki told police that she thought she heard Amie use a lighter to light a cigarette after they were in the car for five minutes. (Lodged Doc. 1 at 15-16.)  Petitioner claims that this evidence would have allowed him to argue that he believed Amie had finished the cigarette he had given her when he opened the valve on the propane.  Further, when coupled with Petitioner's belief that Amie did not have her own lighter, based on the fact he had to light the cigarette he had given to her, there would have been "unduplicated evidence that at the time [Petitioner] turned the valve on the propane tank he had no knowledge, actual or constructive, of any flame source within the vehicle." (Lodged Doc. 1 at 26-27.)

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Docs. 1-3.)  The issue was then raised in a petition for review to the California Supreme Court, which summarily denied the petition. (Lodged Docs. 4-5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that any error in excluding the portions of the police report and refusing to order the production of the deputy was harmless under both the state and federal standards.  The court reasoned that releasing propane into the vehicle constituted assault with a deadly weapon even if Petitioner was unaware of any flame source within the vehicle.  The court further found that, given the age and condition of Petitioner's vehicle, a reasonable person would have been aware that sources other than a lighter or lit cigarette could ignite the propane gas, such as an arc in an electrical switch, the vehicle's ignition, or static electricity.

People v. Georgeson, 2004 WL 1405742, *11-*13 (Cal. App. 2004).

"State prisoners are entitled to habeas relief under 28 U.S.C. § 2254 only if their detention violates the Constitution or a federal statute or treaty.  A state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) (citations omitted).  Further, "[t]o grant relief where a state court has determined that a constitutional error was harmless, we must both determine (1) that the state court's decision was 'contrary to' or an 'unreasonable application' of Supreme Court harmless error precedent, and (2) that the petitioner suffered prejudice under *Brecht* from the constitutional error." Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir. 2005). "Since both the *Brecht* and the AEDPA/*Esparza* tests must be satisfied with respect to harmless error before relief can be granted, we are not obliged to address them in any particular order." Id. at 1061.

The state court's determination that any error in excluding evidence of Nikki's statement to police was harmless was not unreasonable.  Under California law, a deadly weapon is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." People v. Aguilar, 16 Cal.4th 1023, 1028-29 (1997); see also Cal. Penal Code § 245(a)(1).  In determining whether an object not inherently deadly or dangerous is used in a manner likely to produce death or great bodily injury, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. Aguilar, 16 Cal.4th at 1029.  "A person is guilty of unlawfully causing a fire when he recklessly sets fire to or burns or causes to be burned, any structure, forest land or property." Cal. Penal Code § 452. "'Recklessly' means a person is aware of and consciously disregards a substantial and unjustifiable risk that his or her act will set fire to, burn, or cause to burn a structure, forest land, or property.  The risk shall be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Cal. Penal Code § 450(f).

Here, the evidence established that Petitioner placed the propane tank on the back seat of the

1 vehicle and opened the valve, with the nozzle pointing between the front seats where Nikki and
2 Amie were seated.  The propane gas filled the car making it difficult for Amie to breathe.  The
3 evidence also showed that breathing large concentrations of propane may result in suffocation and
4 that inhaling propane vapor may cause dizziness, loss of coordination, unconsciousness, or death.
5 Further, propane could be ignited by an arc in an electrical switch, an automobile ignition, or static
6 electricity.

The propane, as used in this case, was a deadly weapon as defined by California law, even
without ignition, as it was capable of producing and likely to produce death or great bodily injury.
Further, a reasonable person in Petitioner's position would have recognized the substantial risk posed
by potential ignition sources, aside from a lit cigarette or lighter, in an old, poorly maintained
vehicle.  The state court could therefore reasonably conclude that any error in excluding the evidence
in question was harmless.

**C.  Ground Three**

Petitioner argues that the trial court imposed an illegal sentence enhancement and violated the
Sixth Amendment by imposing consecutive sentences.

These claims were generally presented in a petition for writ of habeas corpus to the Fresno
County Superior Court, which denied the petition in a reasoned opinion.  (Lodged Docs. 6-7.)  The
issues were then generally presented in petitions for writ of habeas corpus to the California Court of
Appeal and California Supreme Court, which summarily denied the petitions.  (Lodged Docs. 8-11.)
The Court of Appeal and California Supreme Court, by their "silent orders" denying the petitions,
are presumed to have denied the claims presented for the same reasons stated in the opinion of the
lower court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claims, the Superior Court found that he had not provided sufficient
evidence to warrant habeas relief, noting that habeas relief is generally unavailable for claims that
could have been raised on appeal.  (Lodged Doc. 7 at 1.)

1.  Illegal enhancement

Petitioner claims that the trial court could not properly impose the great bodily injury
enhancement under the 2001 version of Penal Code section 12022.7(a) because his underlying

crimes also required a finding of great bodily injury. At the time of Petitioner's crimes in 2001, section 12022.7(a) read as follows:

> A person who personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which he or she is convicted.

Cal. Penal Code § 12022.7(a) (2001). The current version of section 12022.7(a), which became effective on January 1, 2003, reads in part as follows:

> (a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years.
>
> . . .
>
> (g) . . . Subdivisions (a), (b), (c), and (d) shall not apply if infliction of great bodily injury is an element of the offense.

Cal.Penal Code § 12022.7(a) (2008).

The state court's determination that the trial court could properly impose the enhancement was not unreasonable. Petitioner has not shown that there is any significant difference between the 2001 version of the statute and the current version that is relevant to his case. Further, under either version of the statute, the trial court could properly impose the enhancement, as great bodily injury is not an element of assault with a deadly weapon. See Cal. Penal Code § 245(a)(1) (stating that a person is guilty of assault with a deadly weapon when he or she "commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury").

2.  Consecutive sentencing

Petitioner also argues that the trial court violated the Sixth Amendment by imposing consecutive sentences.

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The Supreme Court, however, has never held that *Apprendi* applies to factual findings used to impose consecutive

sentences. Hong v. Sims, 221 Fed.Appx. 455, 457 (7th Cir. 2007) ("[T]he Supreme Court has never held that *Apprendi* applies to factual findings used to impose consecutive sentences. Indeed, we and several other circuits have held that, so long as the sentence for each individual count does not exceed its statutory maximum, a judge may impose consecutive sentences based on a fact not found by the jury."); see also Oregon v. Ice, 128 S.Ct. 1657 (2008) (granting certiorari to consider whether the Sixth Amendment, as construed in *Apprendi* and *Blakely*, requires that facts necessary to impose consecutive sentences be found by the jury or admitted by the defendant).

The state court's determination was therefore not contrary to, or an unreasonable application of, clearly established Supreme Court law as the sentences imposed by the trial court were not beyond the statutory maximum for the underlying offenses. (*See* RT at 1462-63.)

**D.  Proper Respondent**

Respondent states that the proper Respondent in this action is Kathy Mendoza-Powers. (Answer at 1 n.1.) Pursuant to Rule 25 of the Federal Rules of Civil Procedure, the Clerk will be directed to substitute Kathy Mendoza-Powers as Respondent in this matter.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**ORDER**

The Court HEREBY ORDERS that the Clerk of Court is DIRECTED to substitute Kathy Mendoza-Powers as Respondent in this matter.

<u>IT IS SO ORDERED.</u>

**Dated:    September 24, 2008            /s/ John M. Dixon**
                                    UNITED STATES MAGISTRATE JUDGE